IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| **STANDARD INSURANCE** | § | |
| **COMPANY** | § | |
| | § | |
| **v.** | § | **NO. 4:23-CV-00657-BD** |
| | § | |
| **CARL SCAFURO** | § | |

## MEMORANDUM OPINION AND ORDER

In this diversity suit, Standard Insurance Company sued Carl Scafuro, seeking reimbursement under a group insurance policy. Dkt. 1. Standard's complaint requested declaratory relief, damages for Scafuro's alleged breach of contract, imposition of a constructive trust, and attorneys' fees. *Id.* Scafuro's answer raised several affirmative defenses and asserted counterclaims for declaratory relief, breach of contract, and attorneys' fees. Dkt. 18.

Standard moved for summary judgment on its claims and Scafuro's counterclaims. Dkt. 34; *see* Dkts. 37 (response), 39 (reply). Scafuro moved for partial summary judgment on Standard's request for declaratory relief and one of his affirmative defenses. Dkt. 35; *see* Dkts. 36 (response), 38 (reply). At the parties' request, Dkt. 43 at 3, the court held a hearing on the motions, Minute Entry for June 18, 2026. Each motion will be granted in part and denied in part.

## BACKGROUND

During his employment as a Dallas Independent School District ("Dallas ISD") teacher, Scafuro enrolled in a group long-term disability insurance program offered by Dallas ISD and provided by Standard. Dkts. 18 at 5, 34-2 at 1. After an automobile accident rendered him unable to work, Dkt. 37-25 at 1–2, he applied and was approved for long-term disability benefits under Standard's policy, *id.* at 2; Dkt. 34-2 at 1.

The next year, Scafuro became eligible for retirement benefits. Dkt. 34-2 at 2. He signed a repayment agreement acknowledging that any retirement benefits he received would be considered "deductible income" that would reduce his long-term disability benefits. *Id.* at 2; Dkt. 34-6.

Two years later, Standard discovered that Scafuro had received an $850,000 settlement in connection with the accident. Dkt. 34-2 at 3–4; *see* Dkts. 34-9, 34-10. Citing the policy's subrogation provision, Standard asserted that Scafuro was obligated to reimburse it out of his settlement for the $108,894.45 it had paid him in disability benefits, Dkts. 34-2 at 6, 34-11, an assertion that Scafuro's counsel disputed, Dkt. 34-15 at 1. Standard also asked Scafuro to sign another repayment agreement referencing the settlement, Dkt. 34-13; *see* Dkt. 34-14, but he did not, Dkt. 34-2 at 4.

Standard sued Scafuro, seeking (1) a declaration that the subrogation provision requires Scafuro to reimburse it from his settlement, (2) damages for Scafuro's alleged breach of the policy, (3) a constructive trust on the settlement funds to which Standard claims entitlement, and (4) an award of attorneys' fees. Dkt. 1. In his answer, Scafuro raised defenses based on the policy's time limit for filing suit and Standard's own alleged breach of the policy. Dkt. 18 at 3. He also asserted counterclaims seeking (1) declarations that Standard is not entitled to reimbursement from his settlement and that he is entitled to payment of his disability benefits, (2) damages for Standard's alleged breach of the policy, and (3) an award of attorneys' fees. *Id.* at 8–9.

Scafuro's answer asserted that, "[o]n or about June 28, 2022, [Scafuro] received the last [long-term disability] payment from Standard," which "ceased paying [his long-term disability] benefits thereafter." Dkt. 18 at 7–9. But Standard asserts that, between March and May 2025, it sent Scafuro three letters requesting proof of loss, *see* Dkts. 34-16, 34-17, 34-18, and that his claim was "closed with payment through June 16, 2025," only after he did not respond to any of those letters, Dkt. 34-2 at 5. Scafuro says that he does not remember receiving the letters. Dkt. 37-25 at 3.

In its motion for summary judgment, Standard argued that the policy's subrogation provision and the repayment agreement Scafuro signed entitle it to judgment as a matter of law on its claims. Dkt. 34 at 12–14. It asserted entitlement to summary judgment on Scafuro's counterclaims based on that provision and its assertion that it properly terminated payments after Scafuro failed to provide proof of loss. *Id.* at 14–17. In response, Scafuro argued that Standard cannot rely on the repayment agreement because Standard did not bring a claim for its breach and because the

agreement lacked consideration; that the policy does not give Standard a right to reimbursement, as opposed to subrogation; and that Standard breached the policy. Dkt. 37 at 9–13. Standard's reply argued that the policy does, in fact, give it a right to reimbursement. Dkt. 39 at 2–4. It also argued that, although the repayment agreement is not a new contract, to the extent the policy does not create a right to reimbursement, the repayment agreement is an amendment to the policy that creates that right. Dkt. 39 at 4–5.

In his motion for partial summary judgment, Scafuro argued that the subrogation provision does not give Standard a right to reimbursement and that Standard's claims are time-barred. Dkt. 35 at 5–7. In response, Standard argued that the authorities Scafuro relies on are distinguishable and offered another decision that, in its view, controls instead. Dkt. 36 at 13–17. It also argued that Scafuro's limitations argument is based on a misreading of the policy. *Id.* at 17–20. In reply, Scafuro maintained his position on Standard's lack of a reimbursement right but abandoned his argument based on the policy's provision governing the timing of suit, asserting that a state statute renders that provision ineffective. Dkt. 38 at 7–8.

## LAW

A summary-judgment movant bears the initial burden of demonstrating, by reference to record evidence, if necessary, that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material if, under the governing substantive law, it could affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual issue is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

When the nonmovant would bear the burden of proof at trial, the movant may carry its initial summary-judgment burden by asserting that "the nonmovant has failed to establish an element essential to" its case. *Austin v. Kroger Tex., L.P.*, 864 F.3d 326, 335 (5th Cir. 2017). The nonmovant may then avoid summary judgment by demonstrating the existence of a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "[A] party

opposing a properly-supported summary judgment motion may not rest upon mere allegations contained in the pleadings, but must set forth and support by summary judgment evidence specific facts showing the existence of a genuine issue for trial." *Johnson v. Bd. of Supervisors of La. State Univ. & Agric. & Mech. Coll.*, 90 F.4th 449, 460 (5th Cir. 2024) (quotation marks omitted). Although the court must resolve all reasonable doubts in the nonmovant's favor, *Casey Enters., Inc. v. Am. Hardware Mut. Ins. Co.*, 655 F.2d 598, 602 (5th Cir. Unit B Sept. 1981), "[c]onclusional allegations and denials, speculation, and unsupported assertions are insufficient to avoid summary judgment," *Sanches v. Carrollton-Farmers Branch ISD*, 647 F.3d 156, 165 (5th Cir. 2011).

When presented with cross-motions for summary judgment, the court considers "each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party." *Morgan v. Plano ISD*, 589 F.3d 740, 745 (5th Cir. 2009). "[E]ach movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law." *Shaw Constructors v. ICF Kaiser Eng'rs, Inc.*, 395 F.3d 533, 538–39 (5th Cir. 2004). Summary judgment is appropriate on cross-motions "[i]f there is no genuine issue and one of the parties is entitled to prevail as a matter of law." *Id.* at 539.

## DISCUSSION

### I.  Standard's Claims

Under Texas law, there are "three varieties of subrogation—equitable, contractual, and statutory." *Fortis Benefits v. Cantu*, 234 S.W.3d 642, 648 (Tex. 2007). They are "separate and distinct rights that, while related, are independent of each other." *Id.*

Standard does not seek equitable or statutory subrogation. It seeks contractual subrogation based on the policy. And although Standard might have asserted claims and arguments based on other parts of the policy, it based its complaint and summary-judgment motion on the subrogation provision, which it contends required Scafuro to reimburse it from his settlement for benefits it paid him under the policy. Dkts. 1 at 1–4, 34 at 1–2. Standard's complaint did not mention the

repayment agreement that Scafuro signed. But Standard attempts to rely on that agreement in its summary-judgment motion.

Texas law distinguishes subrogation provisions from reimbursement provisions. Standard's request for relief founders on the policy's lack of the latter type of provision. And even if Standard could properly rely on the repayment agreement despite its failure to mention that agreement in the complaint, its argument that the agreement memorialized existing rights or amended the policy does not save it. Scafuro is therefore entitled to summary judgment on Standard's claims.

### A. The policy's subrogation provision

The subrogation provision reads:

> If LTD Benefits are paid or payable to you under the Group Policy as the result of any act or omission of a third party, we will be subrogated to all rights of recovery you may have in respect to such act or omission. You must execute and deliver to us such instruments and papers as may be required and do whatever else is needed to secure such rights. You must avoid doing anything that would prejudice our rights of subrogation.

> If you notify us before filing suit or settling your claim against such third party, the amount to which we are subrogated will be reduced by a pro rata share of your costs of recovery, including reasonable attorney fees. If suit or action is filed, we may record a notice of payments of LTD Benefits, and such notice shall constitute a lien on any judgement recovered.

> If you or your legal representative fail to bring suit or action promptly against such third party, we may institute such suit or action in our name or in your name. We are entitled to retain from any judgement recovered the amount of LTD Benefits paid or to be paid to you or on your behalf, together with our costs of recovery, including attorney fees. The remainder of such recovery, if any, shall be paid to you or as the court may direct.

Dkt. 34-3 at 43. In that provision, "LTD" stands for long-term disability, *id.* at 26, "you" means Scafuro, *id.* at 23, "we" and "our" mean Standard, *id.* at 23, and the "Group Policy" is the policy in dispute here, *id.*

"Benefits" and "subrogated" are not defined in the policy, so they take their ordinary meanings. *See Pharr-San Juan-Alamo ISD v. Tex. Pol. Subdivisions Prop./Cas. Joint Self Ins. Fund*, 642 S.W.3d 466, 474 (Tex. 2022). "Benefits," in this context, means "financial help in time of

5

sickness, old age, or unemployment"; "a payment or service provided for under an annuity, pension plan, or insurance policy"; or "a service (as health insurance) or right (as to take vacation time) provided by an employer in addition to wages or salary." Merriam–Webster's Collegiate Dictionary 114 (11th ed. 2020). "Subrogation" means the right of one party to "stand in the shoes of another and assert that person's rights against a third party." *US Airways, Inc. v. McCutchen*, 569 U.S. 88, 97 n.5 (2013) (quotation mark omitted) (quoting 1 Dan B. Dobbs, Law of Remedies § 4.3(4) (2d ed. 1993)); *Subrogate*, Black's L. Dict. (11th ed. 2019) (defining "subrogate" as "[t]o substitute (a person) for another regarding a legal right or claim"). When an insurer exercises its subrogation right, it may recover from any settlement or judgment it secures on the insured's behalf. *See Fortis*, 234 S.W.3d at 650–51.

Given all that, the effect of the subrogation provision was that, if a third party did or failed to do something that caused Standard to pay Scafuro benefits under the policy, Standard could step into Scafuro's shoes and enforce whatever rights he had against the third party. It obligated Scafuro to do whatever was needed for Standard to exercise that subrogation right and to avoid doing anything that would prejudice Standard's exercise of the right. And it explained, in its second and third paragraphs, the different sets of additional rights that Standard would have had if Scafuro had notified it that he was suing or settling a claim against a third party, on the one hand, or failed to promptly sue the third party and Standard brought the lawsuit Scafuro could have brought, on the other.

At the hearing, both parties agreed with the court that only the first paragraph of the subrogation provision applies here. Neither side contends that Scafuro "notif[ied] [Standard] before filing suit or settling [his] claim against [a] third party" (the scenario the second paragraph discusses) or "fail[ed] to bring suit or action promptly against such third party," in which case Standard could have "institute[d] such suit or action in [its] name or in [Scafuro's] name" (the scenario the third paragraph discusses). Dkt. 34-3 at 43.

Further, there is no evidence that Scafuro "prejudice[d] [Standard's] rights of subrogation." *Id.* (first paragraph, third sentence). And because Standard could have exercised its rights

independently of any action or inaction by Scafuro by filing a lawsuit or sending a demand letter itself, Scafuro was not obligated to execute and deliver anything necessary for Standard to secure its subrogation rights. *See id.* (first paragraph, second sentence). That leaves only the first sentence of the first paragraph as relevant here. And contrary to Standard's argument, that sentence does not entitle Standard to reimbursement, out of Scafuro's settlement, of the long-term disability benefits it paid him.

"Subrogation" and "reimbursement" are not synonymous. *New Orleans Assets, L.L.C. v. Woodward*, 363 F.3d 372, 374 (5th Cir. 2004) (applying Louisiana law). "With subrogation, an insurer acquires the right to assert the actions and rights of the insured against the liable tortfeasor. With reimbursement, the insurer has only a right of repayment against the insured." *Id.* (citation omitted).

In *Aldous v. Darwin National Assurance Co.*, the Fifth Circuit addressed subrogation rights and held that an insurer's failure to intervene in a lawsuit or settlement prevents it from enforcing a subrogation provision against its insured. 851 F.3d 473 (2017), *vacated in part on other grounds*, 889 F.3d 798 (5th Cir. 2018). *Aldous* involved a lawyer who sued her client for unpaid fees. *Id.* at 476. The client asserted counterclaims, which triggered the lawyer's professional-liability insurance. *Id.* at 476–77. The lawyer eventually prevailed and was awarded her fees, and the insurer paid some of the lawyer's defense costs incurred in connection with the client's counterclaims. *Id.* at 477. But "[f]or whatever reason, . . . [the insurer] did not seek subrogation against [the client]. That is, it did not intervene in the prior litigation, step into the shoes of [the lawyer], and assert (for its own benefit) [the lawyer's] right to attorney's fees against [her client]." *Id.* at 488. The insurer's failure to exercise its subrogation right when it had the chance to do so precluded recovery. *Id.* at 488–89. And based on policy language similar to the language at issue here, the Fifth Circuit held that the insurer could not prevail on a breach-of-contract claim because the lawyer's pursuit of attorneys' fees without the insurer did not breach any part of the contract. *Id.* at 489.

Likewise, Standard had an opportunity to pursue subrogation against the relevant tortfeasors, with or without Scafuro's involvement, but it did not. It was aware that Scafuro's benefits claim

7

arose from a vehicle collision, Dkts. 34-2 at 2, 34-15 at 1–2, 37-4, but it did not seek to participate in the litigation arising from that collision. The policy does not authorize it to recover based on a subrogation right it chose not to exercise. And nothing in the policy required Scafuro to wait for Standard's intervention or approval before settling with the alleged tortfeasors. The subrogation provision did not even require Scafuro to notify Standard that he would sue. *See* Dkt. 34-3 at 43 (second paragraph discussing what could have happened "[i]f" Scafuro had notified Standard "before filing suit or settling [his] claim").

Standard relies on *Fortis*, a case in which the Texas Supreme Court found that an insurer was entitled to relief based on a similarly worded subrogation provision. 234 S.W.3d at 645 n.11. That reliance is misplaced.

In *Fortis*, an insured who had been injured in an automobile collision sued the people and entities she claimed caused or were responsible for her injuries, and her medical insurer intervened in the suit to enforce a contractual subrogation right. *Id.* at 644. The settlement of the personal-injury suit was insufficient to fully compensate the insured, who argued that the "made whole" doctrine extinguished the insurer's subrogation right. *Id.* Under that doctrine, "[a]n insurer is not entitled to subrogation if the insured's loss is in excess of the amounts recovered from the insurer and the third party causing the loss." *Id.* at 645 (quoting *Ortiz v. Great S. Fire & Cas. Ins. Co.*, 597 S.W.2d 342, 343 (Tex. 1980)). But the court held that the "made whole" doctrine applies only to equitable, as opposed to contractual, subrogation. *Id.* at 650.

Standard is therefore correct that the doctrine does not apply in this contractual-subrogation case. Dkt. 36 at 13–14. But *Fortis* does not control the outcome here because, unlike Standard, the insurer in that case exercised its subrogation right. And even if Standard had also done so, *Fortis* would still be distinguishable. As *Aldous* explained, the policy at issue in *Fortis* included not only a subrogation provision of the sort present here but also a reimbursement provision, which Standard's contract with Scafuro did not contain. *Aldous*, 851 F.3d at 489 n.11. *Fortis* reproduced both provisions in the contract at issue there:

8

> **Subrogation Right.** Upon payment of benefits, We will be subrogated to all rights of recovery a Covered Person may have against any person or organization. This includes but is not limited to recoveries against such third party, against any liability coverage for such third party or against automobile insurance in the event a claim is made under the uninsured or underinsured motorist coverages. Such right extends to the proceeds of any settlement or judgment; but is limited to the amount of benefits We have paid. You must 1) do nothing to prejudice any right of recovery; 2) execute and deliver any required instruments or papers; and 3) do whatever else is necessary to secure such rights.
>
> If We are precluded from exercising Our Subrogation Right, We may exercise Our Right of Reimbursement.
>
> **Right of Reimbursement.** If benefits are paid under this plan, and any Covered Person recovers against any person or organization by settlement, judgment or otherwise, We have a right to recover from that Covered Person an amount equal to the amount We have paid. This includes but is not limited to recoveries against such third party, against any liability coverage for such third party or against automobile insurance in the event a claim is made under the uninsured or underinsured motorist coverages.

234 S.W.3d at 645 n.11 (emphasis omitted).

If Standard's policy had included the likes of that final paragraph, the result here might have been different. But the policy did not include a reimbursement provision. As the Fifth Circuit noted in *Aldous*, the insurer in that case did

> not claim[] any contractual right to reimbursement and yet essentially [sought] the same end. "[I]nsurers are well equipped to evaluate and reduce risk by, for example, 'drafting policies to specifically provide for reimbursement,'" and we will not rewrite the contract to grant [the insurer] rights beyond those it included in the contract.

*Aldous*, 851 F.3d at 489 n.11 (quoting *Fortis*, 234 S.W.3d at 649, which quoted *Tex. Ass'n of Ctys. Cnty. Gov't Risk Mgmt. Pool v. Matagorda County*, 52 S.W.3d 128, 136 (Tex. 2000)); *see Matagorda County*, 52 S.W.3d at 132 n.4 (Tex. 2000) (adding that "the presence or absence of a reimbursement clause in the insurance contract could affect the premium charged"). So too here. The court will enforce the policy, which does not provide for reimbursement, as written. *See Fortis*, 234 S.W.3d at 650–51.

Standard also argues that the cases Scafuro cites, including *Aldous*, are inapplicable because they address "whether an insurer may seek reimbursement from its insured for settlement funds

it has paid under a reservation of rights upon an adjudication of noncoverage and/or equitable rights to reimbursement outside of the terms of the insurance policy." Dkt. 36 at 15 & n.69. True, *Aldous* discusses the implications of an insurer's reservation of rights. 851 F.3d at 485–88 (citing *Matagorda County*, 52 S.W.3d at 131). But that discussion does not diminish the effect of the relevant passages concerning subrogation. *Id.* at 488–89.

Standard goes on to assert that, even if it is not entitled to subrogation, it would still be entitled to deduct Scafuro's prorated settlement from future disability payments. Dkt. 36 at 17; *see* Dkt. 34-3 at 41–42. But as its counsel acknowledged at the hearing, Standard's claims are based only on the subrogation provision. Dkt. 1 at 2–4. Any right granted by some other part of the policy does not affect analysis of this case.

### B. The repayment agreement Scafuro signed

Standard also argues that, even if the subrogation provision does not entitle it to reimbursement, the repayment agreement that Scafuro signed does. Dkt. 34 at 12–13. Scafuro responds that Standard cannot obtain summary judgment on a claim that he breached the repayment agreement because its complaint did not include that claim. Dkt. 37 at 9–10 (citing *United States ex rel. DeKort v. Integrated Coast Guard Sys.*, 475 F. App'x 521, 522 (5th Cir. 2012); *Quintanilla v. Tex. Television Inc.*, 139 F.3d 494, 498 (5th Cir. 1998); *Garza v. City of La Porte*, 160 F. Supp. 3d 986, 993 (S.D. Tex. 2016)). Standard replies that the repayment agreement did not need to be pleaded because it was not a new agreement—but that, if the policy language that the court has discussed does not entitle Standard to reimbursement, the repayment agreement was an amendment to the policy that does. Dkt. 39 at 4.

There are three ways to view the repayment agreement. The court need not decide which view is accurate (or whether the repayment agreement was supported by consideration, *see* Dkt. 37 at 11) because none of them gives Standard a right to reimbursement.

The first possibility is that the repayment agreement is a contract separate from the policy. If that is true, Standard could not be entitled to summary judgment based on the repayment

10

agreement because the complaint does not allege a claim for its breach. *See DeKort*, 475 F. App'x at 522.

The second possibility is that the repayment agreement is an amendment to the policy. But if that is the case, the amendment is invalid. The policy provides that "[n]o change or amendment will be valid unless it is approved in writing by one of [Standard's] executive officers and given to the Policyholder for attachment to the Group Policy." Dkt. 34-3 at 54. The meaning of "Policyholder" under the contract is unclear. *See id.* at 17 (policy amendment identifying Dallas ISD as a "Policyowner"), 19 (policy amendment identifying Dallas ISD as a "Policyholder"), 21 (providing that "policyholders" must be "residents of Texas"), 23 (identifying Dallas ISD as the "Policyowner"). But whatever "Policyholder" means, there is no evidence that the repayment agreement was approved in writing by one of Standard's executive officers. *See* Dkt. 34-6 (referencing only James Harrington, a "Disability Benefits Analyst," Dkt. 34-5 at 2). Standard knew how to amend the policy; it did so 15 times with the approval of its presidents and corporate secretaries. Dkt. 34-3 at 1–19. Yet the repayment agreement that Scafuro signed reflects no such approval.

The third possibility is the one Standard's counsel advanced at the hearing: the repayment agreement is neither an amendment to the policy nor a separate contract but rather just a memorialization of Standard's preexisting rights under the policy. But if that is true, the repayment agreement neither expands nor contracts the policy rights. And for the reasons already noted, the policy does not confer the reimbursement right that Standard says it does.

Under none of those three interpretations does the signed repayment agreement entitle Standard to reimbursement. And as Standard admits, Scafuro did not sign the second repayment agreement it sent him, which made specific reference to his settlement, Dkt. 34 at 8, so that agreement could also not support its argument.

11

### C. Scafuro's entitlement to summary judgment on each of Standard's claims

As noted, Standard's complaint asserts four causes of action. Dkt. 1 at 4. Because each of them depends on Standard's flawed interpretation of the subrogation provision, none survives Scafuro's motion for partial summary judgment.

First, Standard asks the court to declare that it "is entitled to reimbursement from Scafuro's recovery with respect to the Personal Injury Lawsuit and Settlement, without any deductions for attorney's fees and expenses, for the payments it has made to or on behalf of Scafuro." Dkt. 1 at 4. Second, Standard asserts that, "[b]y failing to pay the proceeds that have been paid to Scafuro in the Personal Injury Lawsuit to Standard, [Scafuro] is in breach of the Group Policy." *Id.* Third, Standard asks the court to impose a constructive trust on the money it says Scafuro wrongfully withheld from it. *Id.* And fourth, Standard argues that it is entitled to recover attorneys' fees under 29 U.S.C. § 1132(g). *Id.*

Standard's first three causes of action fail for the reasons just explained. And § 1132(g) (assuming, without deciding, that it applies in this context) grants the court discretion to award fees to either party. 29 U.S.C. § 1132(g)(1). The court should not exercise that discretion to award attorneys' fees to a party that did not prevail. *See Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 255 (2010) (holding that a party claiming attorneys' fees under § 1132(g) need not be a "prevailing party" but must still show "some degree of success on the merits" (quoting *Ruckelshaus v. Sierra Club*, 463 U.S. 680, 694 (1983))).

## II. Scafuro's Counterclaims

Scafuro seeks declarations that (1) the policy does not entitle Standard to reimbursement of the amount it claims to be owed and (2) he is entitled to his benefits under the policy. Dkt. 18 at 9. He also alleges that Standard breached the policy by failing to pay him benefits and that he is entitled to attorneys' fees under § 1132(g). *Id.* at 8–9. Scafuro's requests for declaratory relief should be dismissed. His breach-of-contract claim and request for attorneys' fees should not be.

12

### A.  Declaratory relief

With respect to Scafuro's first request for declaratory relief, Standard argues that the subrogation provision entitles it to reimbursement. Dkt. 34 at 14–15. That argument fails for the reasons already noted. But Standard also argues that both of Scafuro's requests for declaratory relief are improper because they are subsumed by the breach-of-contract claims. *Id.* at 14 (citing *Elepreneurs Holdings, LLC v. Benson*, No. 4:21-cv-00026-ALM, 2021 WL 5140769, at \*3–5 (E.D. Tex. Nov. 4, 2021), which "decline[d] to effectuate [the defendants' request for a] declaratory judgment on a claim wholly resolvable by Plaintiffs' affirmative cause of action for breach of contract"); *see also Collin County v. Homeowners Ass'n for Values Essential to Neighborhoods*, 915 F.2d 167, 170 (5th Cir. 1990) (explaining that "[t]he Declaratory Judgment Act is designed to afford parties, threatened with liability, *but otherwise without a satisfactory remedy*, an early adjudication of an actual controversy" (quoted, with emphasis added to the phrase italicized here, in *Elepreneurs*, 2021 WL 5140769, at \*4)).

Scafuro responds that his first request goes beyond a declaration that he did not breach the contract and seeks judicial confirmation "that Standard is not entitled to reimbursement under the Group Policy subrogation provision." Dkt. 37 at 15–16. The question, however, is not whether the requested declaration would restate an element of a claim, but rather whether it would be wholly resolved by another claim. *Elepreneurs*, 2021 WL 5140769, at \*4 (finding that a declaration that a defendant was "not bound by [a] policy" would be resolved by a breach-of-contract claim that would necessarily determine whether a valid contract existed).

Scafuro's first request for a declaration is subsumed by Standard's breach-of-contract claim, which required the court to determine whether Standard was entitled to reimbursement. Scafuro's second request for a declaration, that he is entitled to payment of benefits, is subsumed by his own breach-of-contract claim, which will require the court to determine whether he is entitled to continuing long-term disability payments (a question the court will turn to next). Because both requests for declaratory relief are subsumed by other claims, they should be dismissed.

## B.  Breach of contract

Under Texas law, a breach-of-contract claimant must show that (1) a valid contract exists, (2) he performed or tendered performance of the contract, (3) the defendant breached the contract, and (4) he was damaged by the defendant's breach. *Atrium Med. Ctr., LP v. Hou. Red C LLC*, 546 S.W.3d 305, 311 (Tex. App.—Houston [14th Dist.] 2017), *aff'd*, 595 S.W.3d 188 (Tex. 2020); *Brooks v. Excellence Mortg., Ltd.*, 486 S.W.3d 29, 36 (Tex. App.—San Antonio 2015, pet. denied). One party's breach may be excused if the other party breached the contract first, *Mustang Pipeline Co., Inc. v. Driver Pipeline Co., Inc.*, 134 S.W.3d 195, 199 (Tex. 2004), and a party's performance or tendered performance may be excused when tender would be futile or the opposing party has repudiated the contract, *Chapman v. Olbrich*, 217 S.W.3d 482, 491 (Tex. App.—Houton [14th Dist.] 2006, no pet.).

Here, neither party denies that the policy is a valid contract and that Scafuro was injured by Standard's failure to pay long-term disability benefits under it. But Standard contends that there are two reasons Scafuro's breach-of-contract claim cannot succeed. Dkt. 34 at 15. The first is based on Standard's interpretation of the subrogation provision and fails for the reasons already explained. The second—that Standard permissibly canceled Scafuro's benefits because Scafuro failed to provide proof of loss, Dkt. 34 at 15—requires further analysis.

The policy required Standard to pay disability benefits only after it received "Proof of Loss satisfactory to" it, Dkt. 34-3 at 32, and allowed Standard to terminate benefits if it did not receive "proof of continued Disability and entitlement to LTD Benefits," *id.* at 39. The policy defined "Proof Of Loss" as "written proof that [Scafuro is] Disabled and entitled to LTD Benefits," and it required Scafuro to provide "[c]ompleted claims statements, a signed authorization for [Standard] to obtain information, and any other items [Standard] may reasonably require in support of a claim." *Id.* at 51.

Texas law permits coverage under an insurance contract to be conditioned on delivery of proof of loss within a reasonable time and under reasonable conditions, subject to waiver and estoppel defenses. *Fed. Sur. Co. v. Smith*, 41 S.W.2d 210, 213 (Tex. Comm'n App. 1931); *Great Lakes Ins.*

14

*SE v. Horton Fam. Tr., LLC*, No. 7:19-cv-00138-O, 2021 WL 1117171, at *6 (N.D. Tex. Mar. 24, 2021). Waiver occurs when the insurer, with knowledge of its existing right, manifests an intent to excuse the condition. *Fed. Sur. Co.*, 41 S.W.2d at 212–13. An insurer is estopped when it induces the insured to "change his position for the worse." *Id.*

Scafuro claims not to recall receiving Standard's letters requesting proof of loss, Dkt. 37-25 at 3; that, if he did receive the letters, the documents Standard asked him to complete were not included with them, *see* Dkts. 37-18, 37-24; and that the letters were sent directly to him, rather than his attorney, in contravention of his attorney's request, Dkts. 37-16, 37-18, 37-24.

If Standard's closing of Scafuro's claim was based on his failure to provide proof of loss, those arguments would be insufficient to show that Standard waived or was estopped from enforcing the policy's proof-of-loss provision. And even if Standard's attempt to enforce that provision was imperfect, it still demonstrated an intent to enforce, not an intentional relinquishment of Standard's rights or any action that would mislead Scafuro. *See McKay v. Am. Cent. Ins. Co.*, 245 S.W.2d 529, 530 (Tex. Civ. App.—San Antonio 1952, no writ) (where an insurer's letter stated that a claim had already been submitted but also requested additional information, finding that neither waiver nor estoppel prevented the insurer from enforcing a proof-of-loss provision). Scafuro's sworn statement that he does not recall receiving Standard's letters would normally not suffice either. *See Cliff v. Huggins*, 724 S.W.2d 778, 779–80 (Tex. 1987) (presuming that documents mailed to a party were received by it).

But those were not the only arguments Scafuro made. In addition to averring that he does not recall receiving Standard's letters, he also avers that he stopped receiving payments in June 2022. Dkt. 37-25 at 3. Standard says that it requested proof of loss and discontinued Scafuro's benefits three years later. Dkt. 34-2 at 5. And Scafuro's counterclaims, filed in February 2025, stated that, "[o]n or about June 28, 2022, Mr. Scafuro received the last LTD payment from Standard who ceased paying Mr. Scafuro's LTD benefits thereafter." Dkt. 18 at 7. The counterclaims were filed nearly a month before Standard says it sent its first letter requesting documents, Dkt. 34-16, and four months before Standard says it discontinued payments to Scafuro, Dkt. 34-2 at 5. Combined,

15

those documents and Scafuro's affidavit create a genuine question of material fact about when Standard discontinued payments to Scafuro and why. And although Standard's counsel asserted at the hearing that Standard started setting aside Scafuro's benefits payments in 2022 to offset the amount Standard believes it is owed, he admitted that the summary-judgment record does not corroborate that assertion.

In light of those fact questions, which go to whether Scafuro performed and whether Standard breached, Scafuro's contract claim cannot be resolved at the summary-judgment stage. And because of that, the court will also not resolve Scafuro's request for attorneys' fees at this stage. If today's ruling does not permit the parties to resolve their remaining disputes by agreement, the court will consider them in due course. *See* Dkt. 49 (operative scheduling order).

### CONCLUSION

It is **ORDERED** that:

1) Standard's motion for summary judgment, Dkt. 34, is **GRANTED** to the extent it seeks judgment on Scafuro's requests for declaratory relief and **DENIED** to the extent it seeks judgment on Standard's claims, Scafuro's breach-of-contract claim, and Scafuro's request for attorneys' fees;

2) Scafuro's motion for partial summary judgment, Dkt. 35, is **GRANTED** to the extent it seeks judgment on Standard's claim for declaratory relief, which makes judgment in Scafuro's favor appropriate on each of Standard's remaining claims as well, and **DENIED** to the extent it seeks judgment based on the provision governing the timing of suit;

3) Standard's claims are **DISMISSED WITH PREJUDICE**; and

4) Scafuro's requests for declaratory relief are **DISMISSED WITH PREJUDICE**.

16

So **ORDERED** and **SIGNED** this 22nd day of June, 2026.

_____
Bill Davis
United States Magistrate Judge